IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-743-BO

|  |  |  |
|---|---|---|
| SHEILA LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| OFFICER MOLLY O'HARA, in her | ) | |
| individual capacity, OFFICER RICHARD | ) | |
| J. RODRIGUEZ, in his individual capacity, | ) | |
| OFFICER DON BELL, in his individual | ) | |
| capacity, and KRISTA ZENTNER, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This cause comes before the Court on defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded, defendants have replied, and the motion is ripe for disposition. For the reasons that follow, defendants' motion is granted.

BACKGROUND

Plaintiff initiated this action in December 2023 alleging claims arising from her encounter with City of Fayetteville police officers on December 25, 2020. [DE 1]. Plaintiff filed an amended complaint on March 5, 2024. [DE 24]. By order entered June 20, 2024, the Court dismissed several of plaintiff's claims and defendants. [DE 57].[1] Remaining at this stage for disposition are plaintiff's claims against Officer Molly O'Hara, Officer Richard Rodriguez, Officer Don Bell, and Krista Zentner.

---

[1] This action was originally assigned to United States District Judge Louise Wood Flanagan and reassigned to the undersigned on November 14, 2025. [DE 83].

The following facts are undisputed unless otherwise indicated. *See* [DE 67]; [DE 77]; Local Civil Rule 56.1(a). Plaintiff was involved in a disturbance with the residents of 404 Rodie Avenue in Fayetteville, North Carolina on the evening of December 25, 2020. The residents of 404 Rodie Avenue called the police due to plaintiff's behavior. Defendants Officer O'Hara and Officer Rodriguez were dispatched to the scene. Officer O'Hara and Officer Rodriguez arrived to discover plaintiff standing beside a parked vehicle in front of 404 Rodie Avenue and several people yelling at her. Plaintiff told Officer O'Hara and Officer Rodriguez that she was looking for someone named George, that she believed George had robbed her home, and that the residents of 404 Rodie Avenue had threated plaintiff with a knife and a hammer. Officer O'Hara asked plaintiff to leave the scene and plaintiff got into her vehicle and drove away.

Because Officer O'Hara and Officer Rodriguez had not been told plaintiff's name during the investigation, Officer Rodriguez ran plaintiff's license plate number through his computer DMV database. Plaintiff's license plate did not match the year, make, and model of plaintiff's vehicle and Officer Rodriguez elected to conduct a traffic stop of plaintiff's vehicle to investigate further. Officer Rodriguez began to follow plaintiff while activating his blue lights and siren. Although plaintiff disputes that she ignored Officer Rodriguez's blue lights and siren, Officer Rodriguez's dashboard camera reflects that plaintiff continued to drive for several blocks while Officer Rodriguez was behind her with blue lights activated and using his siren. *See* [DE 75] (Rodriguez dash cam video :30 – 2:00).

Plaintiff stopped and exited her vehicle in front of 216 Faison Avenue and Officer Rodriguez exited his patrol vehicle to make contact with plaintiff. Plaintiff was standing by her vehicle door dancing and singing to music as Officer Rodriguez approached. Officer Rodriguez explained to plaintiff that the traffic stop was related to a fictitious tag on plaintiff's vehicle.

2

During their initial exchange, plaintiff told Officer Rodriguez that she did not live at 216 Faison Avenue and that she did not have her driver's license, she refused to tell Officer Rodriguez her name, and she was generally uncooperative and sarcastic. Officer Rodriguez informed plaintiff that he would put her in handcuffs based on her failure to stop when he tried to pull her vehicle over and that he would go ahead and arrest her; Officer O'Hara, who had arrived on scene, approached and told plaintiff she could either give them her name or be arrested for "RDO" and fictitious tags. *See* [DE 75] Rodriguez (2) BWC at 4:20 – 4:45. Plaintiff then stated "That's not an arrest," and disputed whether she could be arrested for having a fictitious tag. *Id.* at 4:43 – 4:46. Plaintiff was instructed by Officer O'Hara to put her hands behind her back. [DE 75] O'Hara (2) at 1:38 – 1:40.

Officer Rodriguez and Officer O'Hara secured one handcuff on plaintiff's right wrist while plaintiff held up her cell phone with the other hand and called to a bystander to come and get her phone. *Id.* at 1:58 – 2:15. Officers Rodriguez and O'Hara attempted to secure the handcuffs on plaintiff's other wrist; both officers instructed plaintiff to stop resisting and plaintiff stated that she was not resisting, that her hands were behind her back, that if the officers would let go of her hand she would put it in the front, and that she had had shoulder surgery which prevented her hands from going behind her back. Rodriguez (2) BWC at 5:23 – 5:55. Officer Rodriguez informed plaintiff that they would not handcuff her in the front but that they could use "double cuffs."[2] O'Hara (2) at 3:40 – 3:46. Plaintiff then sat down in the front seat of her car, grabbed the seatbelt with her free hand, and refused to exit her car. Officer Rodriguez called for backup.

---

[2] According to defendants, "double cuffs" refers to two handcuffs joined together to make a longer set of handcuffs. *See* [DE 69] at 4.

3

While waiting for backup to arrive, Officer Rodriguez went to the passenger side of plaintiff's vehicle to attempt to remove plaintiff's arm from the seat. Officer Rodriguez contends that plaintiff attempted to bite him, but plaintiff denies this assertion. Officers Don Bell, Krista Zentner, and Kevin Rodriguez arrived at the scene; plaintiff was still seated in the front driver's seat of her vehicle and refusing to leave the vehicle or provide her hands to be handcuffed. Plaintiff also had her seatbelt wrapped around her arm and was grabbing her seat. The officers were eventually able to get plaintiff into double handcuffs in front of her body.

The officers requested that plaintiff exit her vehicle multiple times but plaintiff refused. Plaintiff was then physically removed from her vehicle and placed on the ground outside the front driver's side door. Officer Kevin Rodriguez removed plaintiff from her vehicle while Officer O'Hara held plaintiff's arm. While she was being removed, plaintiff's handcuff caught in the seatbelt. Officer Zentner approached with a knife to cut the seatbelt and contends that plaintiff attempted to grab the knife. Plaintiff disputes that she reached for the knife. Plaintiff's seatbelt was cut and plaintiff's handcuff was freed. Defendants contend that plaintiff bit the seatbelt and that it cut her mouth as it was stretched to its farthest point while plaintiff was being removed to the ground. Plaintiff disputes that she placed her seatbelt in her mouth and contends that one of the officers punched her in the mouth while she was being pulled from the vehicle.

Plaintiff's double handcuffs were removed and leg shackles were used to secure plaintiff's hands behind her back in order to relieve pressure on her shoulders. Plaintiff was asked if she wanted to get off the ground where it was cold, and plaintiff responded that the officers had put her there and that she wanted to see their sergeant. *See* O'Hara (2) at 9:33 – 9:40. While on the ground in restraints, plaintiff spit blood out of her mouth – plaintiff contends

4

that she did not intentionally spit on anyone, but Officer Bell contends that plaintiff spit on him. Plaintiff was placed in a spit mask to prevent her from spitting on any of the officers.

Paramedics were called by the officers to address any injuries plaintiff may have sustained to her mouth. Plaintiff was placed in the recovery position until the ambulance arrived. Once the paramedics arrived, plaintiff resisted the medical personnel and screamed that she thought the paramedics intended to kill her. Plaintiff was ultimately transported to the hospital. Plaintiff did not receive any treatment for a shoulder injury, imaging of her wrist and ankle revealed no fractures or other injuries, and plaintiff remained at the hospital for several days receiving treatment for suspected hallucinations and delusions.

Following the incident, officers appeared before a Cumberland County Magistrate who determined there was probable cause to arrest plaintiff for resisting, delaying, and obstructing an officer and assault on a law enforcement officer. Plaintiff was also issued a citation for having a fictitious tag.

DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence"

5

supporting the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Defendants seek entry of summary judgment in their favor on plaintiff's remaining claims for relief: a Fourth Amendment unlawful detention and false arrest claim brought under 42 U.S.C. § 1983, state law claims for false arrest/imprisonment and malicious prosecution, a § 1983 Fourth Amendment excessive force claim, a § 1983 Fourteenth Amendment excessive force claim, and state law claims for assault, intentional infliction of emotional distress, and gross negligence. Plaintiff has failed to respond to defendants' arguments as to her Fourth Amendment unlawful detention and false arrest claim and as to her state law claims for false arrest/imprisonment, malicious prosecution, and intentional infliction of emotional distress. Plaintiff has therefore conceded that summary judgment on these claims is appropriate. *See, e.g., Feldman v. L. Enf't Assocs. Corp.*, 955 F. Supp. 2d 528, 536 (E.D.N.C. 2013).

Defendants have raised the defense of qualified immunity as to plaintiff's claims for use of excessive force in violation of her Fourth and Fourteenth Amendment rights. Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court employs a two-step procedure for determining whether qualified immunity applies "that asks first whether a constitutional

6

violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When a court's decision on one step is dispositive, it need not reach the other. *See Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378; *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A court "do[es] not make credibility determinations in resolving the first prong of the [qualified immunity] analysis." *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 220 (4th Cir. 2018). However, a court need not adopt plaintiff's version of a fact when that fact is discredited by a videotape of undisputed authenticity. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

A clearly established right requires existing precedent which places "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that a case on point is not required). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal

7

quotations and citation omitted). In making this determination, a court must identify the specific rights the plaintiff alleges were violated at a high level of particularity. *Id.* A court considers both rights that have been specifically adjudicated as well as "'those manifestly included within more general applications of the core constitutional principles invoked.'" *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (citation omitted). Additionally, the right need not be defined "in accordance with the very actions in question." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022) (cleaned up, citation omitted). The determination of whether a right is clearly established is a legal question always answerable at summary judgment. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

A. *Fourth Amendment excessive force*

Law enforcement officers violate an individual's Fourth Amendment rights when they effect a seizure using excessive force. *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). This standard is objective, and thus without regard to the officer's subjective intention or motivation. *Schultz*, 455 F.3d at 477.

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (citations omitted). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and

8

draw[ing] all inferences in favor of the nonmoving party to the extent supportable by the record."
*Scott*, 550 U.S. at 381 n.8 (emphasis omitted).

Plaintiff identifies three uses of allegedly excessive force in violation of the Fourth Amendment in her opposition memorandum: attempting to handcuff plaintiff behind her back, plaintiff's removal from her vehicle, and striking or punching plaintiff in the mouth. Defendants argue that, at the time of this incident, a reasonable police officer would have believed that he had probable cause to arrest plaintiff and that he could use standard law enforcement techniques, such as applying handcuffs and removing plaintiff from her vehicle, to effectuate the arrest of someone who was resisting arrest. Defendants further contend that none of the officers struck or punched plaintiff and that her mouth was injured because she was biting her seatbelt. Plaintiff contends that a long line of cases regarding nonviolent, misdemeanor suspects who were offering minimal resistance to being handcuffed demonstrate that plaintiff's rights were clearly established, and that material facts are in dispute as whether the alleged conduct occurred.

(1) *Handcuffing plaintiff*

Plaintiff argues first that the officers used excessive force when they spent more than three minutes grabbing, shoving, and pulling plaintiff's arms in order to handcuff them behind her back, despite having been told by plaintiff that her arms would not reach behind her back due to prior shoulder surgery.

The Supreme Court has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. While "a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified, as here, in effecting the underlying arrest[,]" *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002), the Fourth Circuit has

9

"has never held that using handcuffs is *per se* reasonable." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018). A court must thus examine the circumstances to determine whether the officer's actions in handcuffing the plaintiff were reasonable. *Id.*

Here, it is undisputed, and the body camera video supports, that plaintiff was uncooperative and refusing to comply with officer commands. Defendants were attempting to place plaintiff in handcuffs behind her back to effectuate her arrest. The officers suggested to plaintiff that she could be put in "double cuffs" to accommodate any shoulder limitation, but that they would not handcuff her in the front as she preferred. "[H]andcuffing an arrestee with his arms behind his back can constitute a constitutional violation if such handcuffing causes pain and injury as a result of a known medical condition." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 382 (D. Md. 2018). In *Stutzman*, the plaintiff had a physically disabling spine condition, was cooperative with law enforcement and did not resist arrest, and screamed in pain when handcuffed behind his back. *Id.* Despite the plaintiff's obvious pain due to being handcuffed, the officers in *Stutzman* did not alter the position of plaintiff's handcuffs during the entire period at issue. *Id.*

Here, plaintiff has proffered no evidence of any shoulder condition or injury prior to the incident, nor has she proffered medical evidence that being handcuffed caused any injury to her shoulder. The body camera footage supports that plaintiff did not scream in pain once handcuffed, and it is further undisputed that plaintiff was ultimately "double cuffed" behind her back and that defendants later used leg irons in order to relieve any strain on plaintiff's shoulders. There is no genuine dispute of material fact as to whether excessive force was used, and defendants are entitled to qualified immunity.

10

(2) *Removing plaintiff from her vehicle*

Plaintiff next contends that Officer O'Hara used excessive force when she assisted in pulling plaintiff out of her vehicle. First, and importantly, Officer Kevin Rodriguez, who plaintiff admits is the officer who physically removed her from her vehicle and placed her on the ground, is not a named defendant in this case. Taking plaintiff's version of events as true, Officer O'Hara was holding plaintiff's arm while plaintiff was removed from her car. The Court is unaware of any case which would support that it was clearly established in December 2020 that holding an arrestee's arm while they are removed from a vehicle, even in light of all of these facts and circumstances, amounts to a violation of the arrestee's constitutional rights.

As plaintiff correctly argues, [s]ince at least 1994, when [the Fourth Circuit] decided *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), it has been clear that *serious physical force –* there, a wrestling maneuver that cracked a suspect's knee – is constitutionally excessive when used against an individual suspected, at most, of a minor crime, who is unarmed, and who does not attempt to flee or physically attack the officer – even if the suspect offers passive resistance, struggling with the officer after an initial use of force against the suspect." *Livingston v. Kehagias*, 803 F. App'x 673, 684 (4th Cir. 2020) (emphasis added) (further noting that refusing to give up one's hands to be handcuffed amounts to passive resistance). Plaintiff here was suspected of only a minor crime, there is no evidence that she was armed or that any of the officers believed her to be armed, and plaintiff did not attempt to flee. Taking plaintiff's version of events as true, she did not attempt to bite any of the officers or take the knife from Officer Zentner. But the record evidence simply does not support the use of serious physical force against plaintiff. No weapons of any kind were utilized by the officers when they removed plaintiff from the car. *Compare Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810

11

F.3d 892, 901 (4th Cir. 2016) (excessive force where individual who had committed no crime but refused to let go of pole in a public area was tased five times). And the body camera footage does not show any of the officers throwing plaintiff to the ground, driving their knee into plaintiff, or wrenching her arm. *See Livingston*, 803 F. App'x at 684; *Smith v. Ray*, 781 F.3d 95, 102-03 (4th Cir. 2015). There is thus no genuine issue of material fact as to whether a constitutional violation occurred when plaintiff was removed from her vehicle.

Nor was the right clearly established. Here, as discussed above, there is no evidence of serious physical force being used against plaintiff in removing her from her vehicle. In 2023, a Western District of North Carolina court, in a case on which plaintiff relies, held that "passively resisting misdemeanor suspects do not have a clearly established Fourth Amendment right not to be taken to the ground during their arrest[.]" *Gunn v. Padgett*, No. 1:21-CV-166-MOC, 2023 WL 6307956, at *6 (W.D.N.C. Sept. 27, 2023). Accordingly, to the extent any constitutional violation did occur while removing plaintiff from her vehicle without the use of serious physical force, the Court determines that the right was not clearly established.

(3) *Plaintiff's mouth injury*

Plaintiff also alleges that she was punched in the mouth while she was being removed from her vehicle, resulting in two teeth being knocked out; plaintiff later testified that her teeth were loosened, not knocked out. *See* [DE 68-3] at 48.[3] The body camera video capturing plaintiff's removal from her vehicle does not show that plaintiff was punched in the mouth in the moments prior to plaintiff stating to the officers "you punched me." *See, e.g.,* [DE 75] Rodriguez (2) 12:00 – 12:27; Zentner BWC 1:00 – 1:20. And while the video footage defendants contend captures plaintiff with the seatbelt in her mouth is unclear, *see also* [DE 77] ¶ 18, the medical

---

[3] The Court relies on CM/ECF pagination when citing to page numbers of documents filed with the Court.

12

records that plaintiff has provided do not support her contention that she was punched in the mouth by one of the officers. Once at the emergency department, plaintiff denied any injury to her teeth. *See* [DE 68-8] at 3. The dental record from plaintiff's visit shortly after she was released from the hospital describes plaintiff complaining of her seatbelt having been forced across her face causing her mouth to bleed on the night of the incident. [DE 68-10] at 1. In plaintiff's deposition testimony, plaintiff states that she was hit with someone's fist and that due to "all of that shaking me, pulling me, tuggling me, my teeth are no longer in the spot that they were before." [DE 68-3] at 44; 49-50. Plaintiff further testified that she was hit by one of the officers, she cannot say which one, with force, but not necessarily with a fist, during the struggle to remove her from the vehicle and further that she cannot see any of the officers hit her with their fist on the body camera footage. *Id.* at 120. Accordingly, the Court finds there to be no genuine dispute of fact as to whether plaintiff was punched in the mouth by any of the officers, and thus, no excessive force was deployed as regards plaintiff being punched. *See Judd v. Langford*, No. 1:19-CV-158-FDW, 2019 WL 4859061, at *3 (W.D.N.C. Oct. 1, 2019) (accidental or negligent conduct does not support excessive force claim).

In sum, defendants are entitled to qualified immunity on plaintiff's Fourth Amendment excessive force claim. Plaintiff has failed to create a genuine issue of material fact as to whether constitutionally excessive force was used when she was handcuffed, removed from her vehicle, or struck in the mouth. Additionally, as to her claim based on her removal from her vehicle, plaintiff has failed to establish that the specific right she alleges was violated was clearly established.

13

B. *Fourteenth Amendment excessive force*

Plaintiff's Fourteenth Amendment excessive force claim fails as a matter of law. This claim is based on plaintiff being put into a spit mask once she was handcuffed and in custody. The Fourteenth Amendment's "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10. Generally, only conduct which "shocks the conscience" will support a Fourteenth Amendment claim. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004).

Defendants argue that a reasonable officer would have believed that he could use a spit mask on a person who had spit blood on or near an officer in furtherance of officer safety. Though plaintiff disputes Officer Bell's statement that she spit blood on him, the body camera video supports that plaintiff was spitting blood. *See, e.g.,* [DE 75] Bell 2:50-3:00. Plaintiff has cited no case which would support that it was clearly established at the time of this incident that utilizing a spit mask on a pretrial detainee who was spitting blood shocks the conscience or otherwise would violate the detainee's Fourteenth Amendment rights. To the contrary, use of a spit mask has been found not to amount to excessive force. *See, e.g., Est. of May by & through Myrick v. Naphcare, Inc.*, No. 1:19-CV-2440-TWT, 2022 WL 327206, at *8 (N.D. Ga. Feb. 3, 2022). Accordingly, defendants are entitled to qualified immunity on plaintiff's Fourteenth Amendment excessive force claim.

C. *State law claims*

As plaintiff has recognized, the survival of her remaining state law claims for assault and gross negligence is tied to her federal claims. *See, e.g., Rowland*, 41 F.3d at 174; *Thomas v. Holly*, 533 F. App'x 208, 223 (4th Cir. 2013). "In North Carolina, official immunity protects a public official performing discretionary acts in the course of his official duties from suit in his

14

individual capacity, so long as the public official acted without malice or corruption or outside the scope of his official duties." *Thomas*, 533 F. App'x at 223. Plaintiff has not proffered any evidence which would support that any of the defendants acted with malice, corruption, or outside the scope of his or her duties. *See Caraway v. City of Pineville*, 639 F. Supp. 3d 560, 587 (W.D.N.C. 2022). Defendants are entitled to public official immunity and summary judgment in their favor on plaintiff's remaining state law claims.

## CONCLUSION

Accordingly, for the foregoing reasons, defendants' motion for summary judgment [DE 66] is GRANTED. The clerk is DIRECTED to enter judgment in defendants' favor and close the case.


SO ORDERED, this 16 day of March 2026.


TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

15